OPINION OF THE COURT
Joseph J. Maltese, J.
The plaintiff, LaSalle Bank, N.A., has been granted reargument of this court’s decision and order dated January 28, 2008 (19 Misc 3d 433 [2008]) that denied its motion for summary judgment on a mortgage foreclosure. After reconsideration this court has made other findings of fact to supplant its original findings, but still denies plaintiffs motion for summary judgment and awards summary judgment in favor of the defendant borrower, David Shearon.
Facts
On January 28, 2008 this court rendered a decision denying the summary judgment motion of LaSalle Bank, the trustee and successor to the original lender WMC Mortgage Corp. (WMC), to foreclose on real property owned by Shearon located at 33 Westport Lane, Staten Island, New York. In that same decision this court awarded summary judgment in favor of Shearon on his first counterclaim. In doing so, this court found as a matter of law that the lender violated Banking Law § 6-1, which prohibits predatory lending.
In determining plaintiffs motion for summary judgment this court finds that during the summer of 2005, David Shearon and his wife, Karen Shearon, who resided in a rental home, decided to purchase their first house. Through the use of a real estate agent from Coldwell Banker, the Shearons agreed to purchase a house for $335,000. They then contacted Glen DeLuca and Michael Farber, two mortgage brokers associated with Liberty *961 Capital Mortgage, on Staten Island, New York,[1] to provide them with all necessary financial information and potential lenders in order to obtain financing for the purchase. At the time the Shearons applied for financing in connection with the purchase of the house, David Shearon had a credit score of 696 and his wife Karen Shearon had a credit score of 760 on a scale where 800 was the maximum score. During August and September 2005, Michael Farber advised the Shearons that he was “shopping around for the best rates” and they would qualify for traditional loan products with fixed interest rates.
However, on October 17, 2005, the Shearons entered into a contract to purchase the $335,000 house, but the written contract listed a purchase price of $355,100 with a “Seller’s Concession” of $20,100. At the execution of the contract, the Shearons placed a deposit of $5,000 with the seller’s attorneys. Therefore, the new balance due and owing on the contract should have reflected $350,100. Instead the financing documents reflected the full $355,100, implying that it would be a “no money down” purchase, when in reality there was a $5,000 deposit.
From the time of the contract execution until closing of title on January 27, 2006, Michael Farber, the mortgage broker, advised the Shearons that WMC would finance the entire purchase price with two loans. Since these mortgages were immediately sold in the secondary mortgage market, the mortgage brokers on behalf of WMC prepared these loans to appear to comply with rules established by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). In order to package this loan for sale in the secondary mortgage market, the lenders must comply with the 80-20 rule, where the first mortgage can be no greater than 80% of the sales price and where the purchasers are to provide the other 20% by way of a deposit and additional funds. But the purchasers did not have $67,000 (20% of the $335,000 sales price) as additional funds. They only had $5,000 as a deposit. Therefore, the mortgage brokers advised the purchasers that they could finance the other 20% plus their real estate fees or closing costs by taking a second mortgage. But to accomplish that and still be in compliance with the 80-20 rule, they increased or “bumped up” the sales price by $20,100 to $355,100. Accordingly, the first mortgage was for $284,000 *962 (79.97% of $355,100, the increased sales price) and the second mortgage was for $71,000 (19.99% of $355,100, the increased sales price). Yet, the true sales price was still $335,000 that should have made the first mortgage ($284,000) 84.78% of the true sales price, which would have violated the 80-20 rule. The second mortgage of $71,000 was 21.19% of the $335,000 sales price. While both Mr. and Mrs. Shearon signed the mortgage application and the contract, somehow at the time of the closing, the closing documents, to include the deed, promissory notes and mortgages, listed only David Shearon as the sole purchaser-borrower.
In his answer to the plaintiff’s complaint to foreclose the mortgage for nonpayment Shearon alleges that he is the victim of “predatory lending” practices by the mortgage brokers and the lender regarding the financing of his home. The defendant borrower alleged the following six separate and distinct acts to justify his claim of predatory lending:
(1) Excessive financing was approved and extended to 106% of the purchase price, which permitted him to finance the points, broker fees, and other costs of the closing;
(2) Improper, inadequate or nonexistent “due diligence” regarding the Shearons’ ability to repay the high cost home loan given;
(3) The intentional and improper placement of the Shearons into “subprime loan” products with excessively high interest rates, longer loan terms and impaired refinancing flexibility to the sole benefit of the lender;
(4) Absent or inadequate state and federally mandated Truth in Lending Act disclosures regarding material elements of the financing being obtained, including, without limitation, matters relating to closing costs and fees, counseling services, loan terms, amortization schedules and balloon payment requirements;
(5) Forgeries of numerous loan related documents, including without limitation (i) the residential loan application, dated November 7, 2005; (ii) the undated “Addendum to Contract of Sale”; and (iii) the “Request for Verification of Rent,” dated January 3, 2006 (purportedly signed by Jennifer Ogman, the Shearons’ then landlord) reflecting inaccurate information used to underwrite the loans; and
(6) The employment of repeated and continuous coercive and concerted tactics by plaintiff and other nonparties who stood to *963 benefit from the loan process, which successfully targeted and forced Shearon to close on the loans and the property or face significant and dire financial consequences to include losing the down payment/deposit, defaulting under the purchase contract and losing the loan commitment.
Upon reviewing these facts, this court denied plaintiffs motion and found that the lender violated Banking Law § 6-1. This court found that the lender extended the borrower a “high cost loan.” Plaintiff now moves for reargument contending that this court misapprehended the facts and law when it found that the loan between WMC and the borrower was “high cost.” In opposing the plaintiffs motion to reargue, Shearon’s attorney argues that the court employed sound reasoning when it found that the loan between WMC and Shearon was a “high cost loan.”
The court heard oral argument on the motion and granted the plaintiffs application for reargument and will now turn its attention to the merits of the arguments by both the plaintiff and defendant.
Discussion
Two Loans to Complete One Transaction
Where purchasers had deposits of less than 20% of the purchase price, private mortgage insurance (PMI)[2] was taken out, which made up for the inadequate deposit. However, PMI payments are not deductible on personal income taxes. But eureka!, interest on a second mortgage was deductible. Consequently, the bank gave the purchaser a second mortgage for the difference between the 80% first mortgage and the 20% deposit money and the real estate expenses to close the two loans. The bank and the mortgage brokers “discovered the gold” in financing a second mortgage loan at more lucrative rates than the first mortgage. To accomplish this goal the mortgage brokers used the guise that the borrowers could pay off the second mortgage earlier than the first mortgage; or the mortgage brokers would find the homeowners a better mortgage later so they could refinance their home with yet more closing expenses in a year or so.
It is undisputed that the money obtained from both loans was necessary to: (1) complete the real estate transaction, (2) satisfy *964 the 80% first mortgage requirement of Fannie Mae and Freddie Mac and (3) avoid the requirements associated with “high cost loans” in excess of $300,000.
Making two loans creates an added windfall that cuts in favor of the lender. While the borrower saves on private mortgage insurance payments, the lenders are able to generate additional closing fees. Moreover, the second loan was at a higher potential rate of interest than the primary loan because it is a riskier loan, which allows the lender to earn additional income based on a higher interest rate.
The contract of sale included a mortgage contingency clause located at paragraph 8 that required the Shearons to obtain a mortgage in the amount of $335,000, which is 100% of the purchase price going to the seller.
The plaintiff vigorously argues that each loan is separate and distinct. The plaintiff argues that the letter of the law must be followed, even though it is clear that one conventional loan at a fixed rate of interest could have completed the transaction. While this court does not condone this form of real estate financing for a multitude of reasons, it will recognize that the Shearons entered into two separate loan agreements with WMC.
Seller’s Concessions Concede Nothing
The real estate contract, which listed $355,100 as the sales price, included a seller’s concession at paragraph 3 (d), which stated: “Sellers Concession-. At closing seller shall grant purchaser a concession in the amount of $20,100.00 to be applied toward purchasers satisfaction of the purchase price. Purchaser shall pay seller for any increase in transfer taxes resulting from the concession.” (Emphasis added.)
The term seller’s concession implies that at the time of closing the seller is conceding a certain amount of the purchase price to enable the purchaser to complete the purchase. Using the facts presented in this case, a seller could concede or reduce an amount of the purchase price in order to pay for a portion of the purchase price and/or the closing expenses. But a seller’s concession as it is utilized in this transaction, is a misnomer with no foundation in logic or mathematics because the seller concedes nothing to the purchasers. In this case, the sellers inflated the price of their home from $335,000 to $355,100 to allow the Shearons to borrow additional funds to close the transaction. The sellers conceded nothing other than to act as coconspirators to circumvent the Banking Law restrictions on *965 the closing costs to mortgage ratios and to manipulate the public records of the true sales prices and market data. The manipulation of the true property value in the public record takes on particular significance because the sales prices are used as comparative prices in real estate appraisals that are used to evaluate other similar sales of homes in the area, as well as in estates, matrimonial matters and partition actions. This false data has been partially responsible for the inflated value of homes in low and middle income areas. By utilizing the seller’s concession the true sales prices are inflated.
The farce of this seller’s concession is best illustrated where the purchaser pays the seller for any increase in the seller’s real estate transfer taxes resulting from the “so called” concession. Indeed the sellers did not even concede the additional tax liability associated with the higher listed “sales price.” Here, the sales price was $335,000 and the seller received $335,000, notwithstanding the additional New York State real estate transfer tax and the New York City real property transfer tax on the additional $20,100 that was added to the contract of sale. The transfer taxes of 1% to the City of New York and .4% to the State of New York (.014 x $20,100) calculate to be a combined additional tax of $281.40, which was rounded up to $282. That sum was disclosed on the closing statement, which the Shearons paid the sellers as an expense of the closing.
The lender’s attorney argued before this court that if the seller’s concession was not provided, “the lender could not have made [its] money.”[3] Additionally, its attorney further argues that by virtue of the fact that this transaction was more than 100% financed, it was clear to the lender that the seller’s concession was going to be used to fund all of the Shearons’ closing costs. In response, the attorneys for the plaintiff bank argue that the loan proceeds provided to the Shearons were used to fund closing costs, but that the so-called seller’s concession was negotiated between the purchaser and the seller with the bank taking no active role in the process. This court finds the plaintiffs argument disingenuous because without the mortgage brokers, who process their loans, using this so-called seller’s concession, there would not have been a loan transaction.
High Cost Home Loans
Banking Law § 6-1 (1) (d) states: “A ‘High-cost home loan’ means a home loan in which the terms of the loan exceed one or *966 more of the thresholds as defined in paragraph (g) of this subdivision.” Amongst the thresholds is subparagraph (ii) of paragraph (g) which states: “(ii) The total points and fees exceed: five percent of the total loan amount if the total loan amount is fifty thousand dollars or more . . . .”
LaSalle contends that this court erred when it determined that the loans WMC entered into with Shearon met the statutory definition of “high-cost home loan.” To support this contention LaSalle argues that Shearon entered into two separate and distinct loans with WMC. As such LaSalle maintains that each loan and its accompanying fees must be evaluated individually without reference to the other loan. In other words, even though the two contracting parties to each of the loans are identical and they are entered into simultaneously, this court should create an intellectual barrier between each loan given to Shearon even though both loans were necessary to complete this real estate transaction.
The defendants allege a specific violation of Banking Law § 6-1 (1) (g) (ii) which states in pertinent part that the “threshold” in this case is where “[t]he total points and fees exceed . . . five percent of the total loan amount.” The statute further defines “points and fees” as:
“(i) All items listed in 15 U.S.C. § 1605 (a) (1) through (4), except interest or the time-price differential;
“(ii) All charges for items listed under § 226.4 (c) (7) of title 12 of the code of federal regulations, as amended from time to time, but only if the lender receives direct or indirect compensation in connection with the charge or the charge is paid to an affiliate of the lender; otherwise, the charges are not included within the meaning of the phrase ‘points and fees’;
“(iii) All compensation paid directly or indirectly to a mortgage broker, including a broker that originates a loan in its own name in a table-funded transaction, not otherwise included in subparagraphs (i) and (ii) of this paragraph;
“(iv) The cost of all premiums financed by the lender, directly or indirectly, for any credit life, credit disability, credit unemployment, or credit property insurance, or any other life or health insurance, or any payments financed by the lender directly or indirectly for any debt cancellation or *967 suspension agreement or contract, except that insurance premiums calculated and paid on a monthly basis shall not be considered financed by the lender.”[4]
The Banking Law incorporates the United States Code and the Code of Federal Regulations. 15 USC § 1605 (a) (l)-(4) includes the following points and fees:
“(1) . . . [A]ny amount payable under a point, discount, or other system of additional charges.
“(2) Service or carrying charge.
“(3) Loan fee, finder’s fee, or similar charge.
“(4) Fee for an investigation or credit report.”
The following charges from 12 CFR 226.4 are exempt in calculating the threshold requirement in high cost home loans except in the event that “the lender receives direct or indirect compensation in connection with the charge or the charge is paid to an affiliate of the lender”:
“(7) Real-estate related fees. The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:
“(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.
“(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.
“(iii) Notary and credit report fees.
“(iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.
“(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.”[5]
The plain language of Banking Law § 6-Z places the burden squarely on the party wishing to include real estate fees[6] in the calculation of the threshold amount. In the case before this *968 court Shearon argues that these charges are properly included in the threshold calculation. In this case, the Shearons received bills from third-party contractors and not WMC with respect to the above-referenced charges. As such, whether these charges are properly included in calculating the threshold amount turns on whether WMC received an “indirect” compensation in connection with the above-listed charges.
This real estate transaction was conditioned on whether the Shearons could obtain a mortgage for $335,000 or 100% of the true sales price, rather than the $355,100 amount, which included the seller’s concession. Both figures were fully disclosed to the lender. Despite the language used in the seller’s concession that seemingly indicates that the $20,100 will be applied toward the purchase price, it is clear that the Shearons used the additional $20,100 financed to pay the real estate fees necessary to close the transaction.
Based on the contractual language contained in the evidence submitted for consideration, this court finds as a matter of law that the lender, WMC, indirectly received compensation in the form of interest on the loan used to finance the real estate fees at the time of closing. In this case, the contract between the parties fully disclosed to the lender that the entire transaction was to be financed, including the real estate fees. The contractual language is without ambiguity as to whether the lender, the quintessential well-informed contractual party, understood that it was financing the real estate fees through the “seller’s concession.”
Total Allowable Points and Fees
This court must now determine whether the plaintiff violated the threshold amount associated with “high-cost home loans” when it financed 100% of the purchase price plus all relevant real estate fees.
The following list summarizes the totality of expenses and fees incurred in connection with the two loans given to the Shearons in connection with the purchase of 33 Westport Lane, Staten Island, New York as presented by the Shearons. To compile this accounting of expenses and fees associated with the two loans Shearon relied on the HUD-1 Uniform Settlement Statement, the cancelled checks of Amy Buchansky-Francesco ’ s *969 attorney IOLA account, as well as the closing statement provided by their attorney. The following are all of the listed “real-estate related fees” (closing expenses) for the transaction in question. The fees allegedly for the second mortgage are annotated as “Second Mortgage Loan.”
First Mortgage Loan Expenses: Fees
Origination fee to HCI Mortgage $5,680
Appraisal fee to HCI Mortgage $350
Credit Report fee to HCI $13.62
Tax Service Fee $20
Flood Determination fee $12
Processing Fee HCI Mortgage $998.79
Administration Fee HCI Mortgage $597
Bank Attorney Fee $950
Loan Delivery Fee to Federal Express $115
Title premium to First Gotham $2,288
Title search to First Gotham $365
Title endorsements to First Gotham $100
Market Value Rider to First Gotham $189
Survey Fee to Carlye Ian Douglas $650
Overnight Fee to First Gotham $60
3rd & 4th Quarter Real Estate Tax Escrow $940
Escrow Deposit Fee to First Gotham $75
Title Closer Attendance Fee to Nicole McCarthy $125.00
Total Expenses First Mortgage Loan $13,528.41
Second Mortgage Loan Expenses Fees
Title Closer Attendance Fee to Nicole McCarthy $175
Processing Fee to HCI (Second Loan) $698.79
Administration Fee to HCI (Second Loan) $450
Bank Attorney Fee (Second Loan) $550
Bank Attorney Courier Fee (Second Loan) $95
Title Premium Fee to First Gotham (Second Loan) $78
Endorsements to First Gotham (Second Loan) $100.00
Total Second Mortgage Loan Expenses $2,146.79
Yield spread/broker fee to Liberty Capital $6,692.42
Total Expenses First & Second Mortgage Loans $22,367.62
It is the finding of the court that the Shearons entered into two separate and distinct mortgages to effectuate the purchase *970 of 33 Westport Lane, Staten Island, New York. The court recognizes that the expenses of the second loan cannot be utilized in a threshold calculation against the principal of the first loan. As such any threshold analysis here must omit those fees associated with the second loan.
The defendant’s attorneys have produced a photocopy of the closing agent’s attorney IOLA account check in the amount of $6,692.42 to Liberty Capital, which they have characterized as a “lender paid yield spread/broker fee to Liberty Capital.” However, after a search of the record this court does not find a payment of $6,692.42 listed on the HUD-1 forms for either the first mortgage or the second mortgage.
The court recognizes that at real estate closings the attorneys sometimes draft checks to parties covering more than one fee. Absent any evidence in the record of an additional loan spread fee of $6,692.42 to Liberty Capital and given the defendant’s attorneys’ concession in their written and oral arguments that their original argument may be in error this court will treat this $6,692.42 as an error at the closing table and as such will not include that amount in the calculation of the threshold amount.
The following threshold analysis omits the second loan fees along with the alleged lender paid yield spread/broker fee to Liberty Capital of $6,692.42 that does not appear to have been paid from the evidence before this court. The court finds that in order to purchase 33 Westport Lane, Staten Island, New York the Shearons paid the following real estate fees that are included in a threshold analysis:
Title Closer “Pick Up” Fee
This court takes judicial notice that it is the obligation of the seller, absent a written agreement to the contrary, to pay and record the tax returns for the New York City real property tax and the New York State real estate transfer tax, along with any mortgage satisfaction document, if any. At the closing of the real estate transaction, a “title closer” generally collects the tax checks along with the tax returns and any filing fees. This is known commonly as a “seller’s pick up fee.”
The purchaser has similar responsibilities at the closing. The court also takes judicial notice that a buyer has an obligation to record their newly acquired deed and mortgage to the premises as a requirement for the loan. The purchaser also must pay and file the tax return for the New York City mortgage recording *971 tax, along with any other fees that are similarly collected, by the title closer. For this service the title closer is paid a fee commonly known as the “purchaser’s title pick up fee.” Therefore the title closer is receiving two fees — one from the seller and one from the buyer. While both fees are required, both are not expenses of the purchaser/mortgagor — only one is.
In this case a purported pick up fee in the amount of $175 is at issue between the parties. Shearon argues that he paid this fee at closing and has, therefore, properly included it in calculating the threshold amount. In its reply papers, the plaintiff argues that this $175 fee is a seller’s expense. As the court has already articulated, both the seller and the purchaser are entitled to claim their respective pick up fees as expenses for closing.
Both parties agree that Ms. Nicole McCarthy acted as the title closer for the closing. A review of the record indicates that she received two payments from the IOLA account of Amy Buchansky-Francesco, Esq., in the amount of $175 and $125. The purchaser was only responsible for the $125 payment, as the “purchaser’s title pick up fee,” and it is, therefore, properly included in the calculation of the 5% threshold formula.
Real Estate Tax Escrow
It is generally recognized that real estate tax escrow deposits are not included as a real-estate related fee under the federal regulations.[7] However, there is an exception to this general rule. The Banking Law recognizes that these charges are properly included in a calculation of points and fees paid by the borrower “only if the lender receives direct or indirect compensation in connection with the charge.”[8]
This court finds that the monies paid by the buyer for third and fourth quarter real estate tax escrow fees are properly included in a calculation of points and fees paid by the borrower as a matter of law. It is clear from the documents that the plaintiff knew that the defendant purchaser financed 100% of the purchase price as well as all of the real estate fees and expenses to include the tax escrow collected at the closing.
The court holds that where a purchaser’s entire real estate tax obligation is financed by a lender, as is the case here, the lender indirectly profits by increasing the amount of the loan, which in turn generates higher closing fees on the loan, which *972 increases interest payments paid over the life of the loan. Accordingly, the monies paid by the purchaser in escrow for the third and fourth quarter real estate taxes are properly included in the calculation of the total points and fees paid by the purchaser-borrower because he borrowed the money from the lender to pay them.
Calculation of Threshold
Banking Law § 6-l (1) (h) contains a formula that calls for the loan amount to be reduced by the total allowable points and fees paid by the borrower. In this case, the amount of the first mortgage is $284,000 and the total fees are $13,528.41. Therefore, subtracting $13,528.41 from $284,000 equates to $270,471.59 as the total loan amount for the threshold formula.
In order to determine the threshold, the statute requires that the amount of the total loan be multiplied by 5%.[9] Therefore, $270,471.59 multiplied by .05 equals $13,523.58. This figure represents the maximum amount of total allowable points and fees that may be paid by the purchaser-borrower.
In this case, the actual total points and fees paid by the purchaser-borrower was $13,528.41, which exceeds the total allowable points and fees by $4.83.[9]
[10] The lender therefore violated the statutory provisions of the Banking Law.
Conclusion
The defendant, David Shearon, has demonstrated that the lender WMC violated Banking Law § 6-1, a statute designed specifically to protect the rights of borrowers. Accordingly, the plaintiff may not foreclose on the mortgage. However, the resolution of this matter must proceed to a hearing on damages, where the defendant borrower may be entitled to receive actual, consequential and incidental damages, as well as all of the interest earned or unearned, points, fees, the real estate fees to close the loan, counsel fees and a refund of any amounts paid.
Accordingly, it is hereby ordered, that the motion of the plaintiff, LaSalle Bank, as trustee for WMC, to reargue this court’s previous order having been granted, the court finds that the original mortgagee, WMC, violated Banking Law § 6-1 and *973 therefore LaSalle Bank may not foreclose on this mortgage; and it is further ordered, that the defendant David Shearon’s cross motion for summary judgment on the violation of Banking Law is granted, but the parties shall appear before this court for a hearing on damages.

. Liberty Capital Mortgage was doing business as HCI Mortgage Company located in Lake Ariel, Pennsylvania.

. Private mortgage insurance constitutes that portion of the purchase price of a primary residential premises not paid for by either a cash deposit or a first or primary purchase-money mortgage exclusive of any second mortgages.

. Transcript at 42.

. Banking Law § 6-1 (1) (f) (emphasis added).

. 12 CFR 226.4 (c) (7) (emphasis added).

. In real estate transactions the aforementioned “[r]eal-estate related fees” mentioned in the federal regulation and statutes are also known as *968 “closing costs or fees.” For the purposes of statutoiy interpretation, this court will use the term “real estate fees” as it is the language adopted by the state legislature when it incorporated the federal statute and regulation by reference into Banking Law § 6-1.

. 12 CFR 226.4 (c) (7).

. Banking Law § 6-1 (1) (f) (ii) (emphasis added).

. Banking Law § 6-1 (1) (g) (ii).

. $13,528.41 - $13,523.58 = $4.83.